IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION


SANDRIA LEWIS, Individually
and as Administratrix of the
Estate of KENNETH BROWN, deceased                    PLAINTIFF

        v.              CASE NO. 07-6033

BRANDON THOMASON and
CITY OF ROCKPORT, ARKANSAS                          DEFENDANTS

### MEMORANDUM OPINION & ORDER

     Before the Court are Defendants Brandon Thomason and the
City of Rockport's Motion for Summary Judgment (Doc. 94),
Plaintiff Sandria Lewis's Response (Doc. 98), and Defendants'
Reply (Doc. 101).  The Motion before the Court is a substitute
for Defendants' previous Motion for Summary Judgment (Doc. 49),
which is accordingly **DENIED AS MOOT.** For the reasons discussed
below, Defendants' Motion (Doc. 94) is **GRANTED IN PART AND
DENIED IN PART.**

## A. Standard of Review

     Summary Judgment is appropriate only where there is no
genuine issue of material fact and the moving party is entitled
to judgment as a matter of law. Fed. R. Civ. P. 56(c). The
burden of proof is on the moving party to set forth the basis of
its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The
Court must view all facts and inferences in the light most
favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v.
Zenith Radio,* 475 U.S. 574 (1986). "The non-moving party,

however, must still 'present evidence sufficiently supporting
the disputed material facts that a reasonable jury could return
a verdict in [his] favor.'" *Pope v. ESA Services, Inc.*, 406 F.3d
1001, 1003-04 (8th Cir. 2005). Under Local Rule 56.1(c) all
facts set forth in the statement of undisputed facts filed by
the moving party will be deemed admitted unless controverted by
the nonmoving party.

**B. Facts**

The following facts are undisputed, except where noted.

Brandon Thomason is the Chief of Police for the City of
Rockport and has over fourteen years of law enforcement
experience. Thomason received certification as a law enforcement
officer from the Arkansas Law Enforcement Training Academy.
Thomason is a firearms instructor, a member of the SWAT team,
and has received roughly four times the training of an ordinary
police officer in Arkansas. Before this incident, Thomason had
never used his weapon against person in the line of duty, and
the Court has not received information suggesting that any other
Rockport police officers have used their duty weapons to
effectuate a deadly force arrest.

The City of Rockport has written policies and customs that
both parties agree are not unconstitutional, including the
Police Policy and Procedure Manual. The welcome section of the
Manual is signed by the Mayor. In Section 4, there is a

2

memorandum from the Chief of Police stating that "the contents of this manual, any general or special orders [sic] shall not be canceled, amended, or new orders issued without the approval of, and over the signature of the Chief of Police." The next section gives the Chief of Police the authority to terminate, demote, suspend, or issue other sanctions for failure to perform duties or violations of departmental rules, regulations, etc. The manual shows a police organizational structure that places the Chief of Police between the Mayor and the Patrol Sergeant. Darrell Hughes, who was Mayor of Rockport in November 2006, has stated that only the City Council of Rockport possesses policymaking authority for the police department.

At about 10:00 a.m. on November 27, 2006, Rockport/Magnet Cove Volunteer Fire Chief Damon Dyer and the fire department responded to a mobile home fire at 1296 Doyle Jones Road in the Magnet Cove community of Hot Spring County. The mobile home was occupied by the decedent, Kenneth Brown, who may have had mental problems. When firemen arrived at Brown's trailer, they attempted to move Brown away from the fire but he was uncooperative. Brown attacked Dyer with a ballpoint pen, tearing his shirt and leaving a visible scrape injury on his chest and abdomen. Chief Dyer believed that Brown may have had a knife; in addition, Brown threw rocks and swung sticks at the firemen.

Thomason arrived at the scene in a marked police vehicle.

3

Before Thomason arrived, he heard on his radio that Brown had used a knife to stab a firefighter. Shortly after Thomason arrived at the scene, the firemen at the scene identified Brown as the attacker. Brown and Sandria Lewis, Brown's mother, got into a car and proceeded to travel in reverse down the driveway. Lewis claims she was trying to get Brown away from the fire and calm him down. After the car occupied by Brown and Lewis stopped, the firemen began shouting at Thomason to watch out for burning electrical lines, which soon fell on Thomason's car. Once Brown and Lewis's car stopped, Brown exited the car by the window and started running towards nearby woods. Lewis got out of the car and shouted at Thomason to stop. At this point Lewis and Thomason made physical contact, but who initiated the contact is unclear. There was enough force in the contact to knock Lewis to the ground. Up to this point, the facts are not disputed in any meaningful way.

After Lewis and Thomason engaged in contact, the versions of events differ substantially. Lewis claims that once she was on the ground, Thomason fired two shots at Brown, but Thomason denies firing these shots. Thomason claims that once Brown was some thirty to forty yards into the woods, Brown stopped, and Thomason then drew his weapon and ordered him to lie down, but Brown did not respond. Thomason then claims Brown started to crouch and lean as though complying with Thomason's order.

4

Thomason asserts he holstered his gun and reached for Brown's arm to handcuff him. Thomason claims Brown grabbed a large piece of wood and struck him on the left side of his head, back, and shoulder and yelled for Thomason to shoot him. The force of the impact dazed Thomason, but he was able to pull his weapon and fire three times. Thomason claims he was then able to back up about ten to fifteen feet, but became tangled in a thicket. Brown went to the ground and Thomason directed a firefighter to call for an ambulance. Thomason noted that Brown was frothing at the mouth during the whole encounter. Afterwards, pictures were taken of Thomason's face which showed scratches and possible bruising. Other pictures showed blood on a piece of wood. Thomason claims he only fired three shots. Other witness accounts only corroborate three shots.

Lewis claims she did not see Brown attack Thomason with a piece of wood, but says Brown was on his knees trying to surrender. She claims she saw Thomason incur his facial injuries when he ran through a blackberry patch. Lewis claims she witnessed the encounter between Brown and Thomason from the road, where she had fallen. The differences in the two accounts are the number of shots fired and whether Brown attacked Thomason with a piece of wood. It is undisputed that three shots were fired in the woods, but whether Thomason fired two shots from the road is disputed.

5

The Defendants claim that internal contradictions in Lewis's version of events, other witness accounts, and the denseness of the woods make her account of events so incredible that no reasonable jury would believe it. After reviewing the photographs of the scene and the limited portions of Lewis's deposition made available, the Court concludes that Lewis's story is sufficient to submit to a jury.

After the shooting, the Arkansas State Police investigated the scene, and found three cartridges in the woods as well as the bloody log. Damon Dyer's testimony indicates that when he saw Brown, he was bleeding from two places in the chest and one place in the neck. John Webb, M.D. noted that a bullet went through Kenneth Brown's chest cavity. He noted four bullet wounds on Brown, three on the left side of his torso, and one on his wrist.

Lloyd Grafton, the Plaintiff's expert, agreed that Thomason was legally justified to take Brown into custody. He considered Thomason's actions, even if his version is credited, to be poor policing, noting that Thomason had chemical spray and a baton, which were more appropriate than the firearm. It is undisputed that based on the reports that Brown attacked firefighters with a knife, and that Thomason was justified in taking Brown into custody.

Dr. Absalom Tilley, who treated Brown for his medical

6

conditions other than the immediate effects of the gunshot wound, stated that it was more likely than not the gunshot wound aggravated Brown's existing medical condition. Brown suffered from serious hypertension and diabetes as well as chronic obstructive pulmonary disease (COPD). According to Dr. Tilley, the cause of Brown's COPD was likely a combination of diabetes and smoking. Dr. Tilley testified that the gunshot wounds increased his likelihood of having an exacerbation of this condition. However, Dr. Tilley said that he had no basis for an opinion that the gunshot wound accelerated the progression of the disease.

Brown died on February 15, 2008. According to his medical records, Brown did not take all the medications his doctors believed appropriate. The autopsy concluded Brown's death was naturally caused by hypertensive arteriosclerotic cardiovascular disease. Frank Peretti, the forensic pathologist who performed the autopsy, said in his deposition that the gunshot wound could have increased stress.

**C. Discussion**

　　**1. § 1983 Liability of Thomason in his Individual Capacity**

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State...subjects, or causes to be subjected, any citizen of the United States...to the deprivation of any rights, ...secured by the Constitution and

AO72A
(Rev. 8/82)

laws, shall be liable to the party injured in an action at law."
42 U.S.C. § 1983. The purpose of § 1983 is to deter state actors
from using the badge of their authority to deprive individuals
of their federally guaranteed rights and to provide relief to
victims if such deterrence fails. *Wyatt v. Cole*, 504 U.S. 158,
161 (1992).

Law Enforcement Officers have qualified immunity from
liability in their individual capacity unless they violate a
clearly established right of which a reasonable person would
know. *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982).
"Qualified immunity protects all but the plainly incompetent or
those who knowingly violate the law." *Malley v. Briggs*, 475 U.S.
335, 341 (1986). In this case, it is undisputed that Thomason
acted under color of law.

### a. Constitutional Rights Violation – Wrongful Arrest

Lewis first argues that Thomason violated Brown's
constitutional rights by wrongfully arresting him. The test of
wrongful arrest is whether a reasonable officer could have
believed the arrest to be lawful. *Garionis v. Newton*, 827 F.2d
306, 308 (8th Cir. 1987). "The usual rule is that a police
officer may arrest without warrant one believed by the officer
upon reasonable cause to have been guilty of a felony." *U.S. v.
Watson*, 423 U.S. 411, 417 (1976) (quoting *Carroll v. United
States*, 267 U.S. 132, 156 (1925)). Flight, coupled with

8

knowledge relating a suspect to evidence of a crime, is a proper factor to consider in a decision to make an arrest. *Kelly v. Bender*, 23 F.3d 1328, 1330 (8th Cir. 1994), *abrogated on other grounds by Johnson v. Jones*, 515 U.S. 304 (1995).

In this case, Thomason heard on his radio that Brown had attacked a firefighter and was armed with a knife. Once on the scene, the firefighters identified Brown as the attacker. Brown then appeared to flee the scene, and these facts are sufficient for Thomason to have probable cause to arrest Brown. Therefore, Thomason did not violate Brown's constitutional rights by arresting him. Defendants have no liability for wrongful arrest and are therefore entitled to summary judgment on Lewis's claims relating to wrongful arrest.

### b. Constitutional Rights Violation – Excessive Force

Lewis also argues that Thomason violated Brown's Fourth Amendment rights by subjecting him to excessive force. "[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1989). Objective reasonableness is the test used for analyzing the merits of Fourth Amendment excessive-force claims. *Wilson v. Spain*, 209 F.3d 713, 716 (8th Cir. 2000). The Supreme Court requires consideration of three factors for determining the reasonableness of force. *Graham v. Connor*, 490 U.S. 386, 396

9

(1989). Those factors are the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.*

For purposes of summary judgment, the Court is required to assume the facts that a rational jury could conclude most favorably to the non-moving party. Therefore, the Court credits Lewis's account that Thomason fired two shots from the road at Brown and fired three shots at Brown while he was on his knees and appearing to surrender. Thomason could reasonably have believed that Brown attacked someone with a knife. At the time of the alleged first shots, Thomason had reason to believe Brown was armed with a knife and he appeared to be fleeing into the woods. He was running away from people on the scene and did not appear to have a weapon in his hand. According to Lewis, Brown was on his knees attempting to surrender when Brown fired the three shots. Therefore, Brown was no longer attempting to flee and did not appear to threaten the officer or others.

Based on the foregoing, the facts of the events are in dispute, but when the facts are viewed most favorably to the nonmoving party, Thomason's use of deadly force was clearly unreasonable and clearly unlawful to the extent that qualified immunity is unavailable. The key disputes in this case, are factual, not legal, and genuine issues of material fact exist

10

**AO 72A**
**(Rev. 8/82)**

that must be submitted to a jury. Summary Judgment on Lewis's excessive force claim is hereby **DENIED.**

## 2. 1983 Liability of the City of Rockport

For a municipality to be liable under § 1983, the municipality itself must cause the violation at issue. "*Respondeat superior* or vicarious liability will not attach under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989). Section 1983 liability attaches only when execution of the governmental entity's policy or custom causes the injury. *Monell v. Dept. of Soc. Serv.*, 436 U.S. 658, 694 (1978). Because a municipality can act only through its employees, the municipality in question must be held liable for the acts of its employees executing the unconstitutional policy or custom. For the purposes of § 1983 liability, the municipality should be viewed less as an employer, and more as a nexus of policies. These policies fall into two broad types, official and unofficial.

### a. Municipal Liability Based on Official Policy

It is undisputed that the written, stated policies of the City of Rockport are not unconstitutional. What is disputed is whether Thomason, as Chief of Police, is a policymaker for the municipality such that his actions constitute official policy for the city.

A municipality's unconstitutional official policy as

11

promulgated by a legal policymaker may subject the municipality to liability under § 1983. "[M]unicipal liability may be imposed for a single decision by municipal policymakers." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). Whether by a single official with policymaking authority, or a legislative body, the municipal policy or custom must be the "moving force [behind] the constitutional violation." *Monell*, 436 U.S. at 694. Whether a particular official has policymaking authority is a question of state law. *McMillian v. Monroe County, Ala.*, 520 U.S. 781, 786 (1997). Determination of the powers granted by state law is a question of law, not of fact, and official policies can only be adopted by those legally charged with doing so. *St. Louis v. Praprotnik*, 485 U.S. 112, 124-25 (1988).

Both sides agree that Rockport is a city of the second class. State law governing cities of the second class states that "[t]he city council shall have power to establish a city police department, [and] to organize it under the general superintendence of the mayor," Ark. Code Ann. § 14-52-101. Other federal district courts in Arkansas have concluded that police chiefs in cities of the second class lack the authority to be policymakers. *See Breedlove v. City of Coal Hill*, No. 08-2018, 2009 WL 160301, 2009 U.S. Dist. LEXIS 4026 (W.D. Ark. January 21, 2009); *See also Graves v. Sullivan*, No. 4:06-cv-1710, Doc. 92 (E.D. Ark. May 21, 2008).

This Court agrees that as a matter of Arkansas law, police chiefs of cities of the second class are not able to make policy by virtue of their actions. To hold otherwise would create a class of employees for which cities would bear respondeat superior liability under § 1983. To some extent, every municipal employee can be said to make "policy" when they make decisions about how to carry out their duties. Every supervisor makes decisions that affect their subordinates and every employee, from the highest to the lowest, makes decisions that have some impact on the public. Such "policy" would come from the employee, not the municipality. For a single act to constitute municipal policy, the actor must have the legal and actual authority to bind the municipality and speak for it.

In this case, Plaintiffs argue that the authority of the Chief of Police to amend the Police Policy and Procedure Manual means that Thomason possesses policymaking authority. Based on *Praprotnik* and the Arkansas statute, Thomason lacks the legal authority to be a municipal policymaker for purposes of § 1983 liability.

### b. Municipal Liability Based on Unofficial Policy

In addition to official policy, unconstitutional unofficial policies of the municipality may give rise to liability under § 1983. To show unofficial policy that can give rise to municipal liability, the Eighth Circuit requires a showing of three

13

elements:

> (1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
> (2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
> (3) The plaintiff's injury by acts pursuant to the governmental entity's custom, i.e., proof that the custom was the moving force behind the constitutional violation.

*Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). The Eighth Circuit has further applied *Monell* to mean that a plaintiff must either show an official policy "or misconduct so pervasive among non-policymaking employees of the municipality 'as to constitute a custom or usage' with the force of law." *Kuha v. City of Minnetonka*, 365 F.3d 590, 603 (8th Cir. 2003) (citing *Monell*, 436 U.S. at 691), *overruled on other grounds by Szabla v. City of Brooklyn Park*, 486 F.3d 385 (8th Cir. 2007).

In support of her contention that there is a continuing, widespread, persistent pattern of unconstitutional misconduct, Lewis points to two incidents. The first is an unreasonable arrest allegation from another case that led to a civil rights action filed in this court. In granting summary judgment to the defendants, we found no constitutional violation. That would leave one instance of possible unconstitutional conduct, and one instance of prior unconstitutional conduct is insufficient for a "a continuing, widespread, persistent pattern" as required by

14

AO72A
(Rev. 8/82)

the Eighth Circuit.

Based on the foregoing, Defendants' Motion for Summary Judgment as concerns Lewis's claims against Thomason in his official capacity and against the City of Rockport for § 1983 liability is **GRANTED** and these claims are **DISMISSED WITH PREJUDICE**.

### 3. State Law Claims Against Thomason Individually

#### a. Assault and Battery

##### i. Statute of Limitations

The statute of limitations for assault and battery in Arkansas is one year. Ark. Code Ann. § 16-56-104. The alleged assault and battery took place on November 27, 2006. The original complaint was filed April 19, 2007, which was well within the limitations period. However, neither that complaint, nor Lewis's first or second amended complaint named Thomason in his individual capacity. In Lewis's original complaint, she alleged facts insufficient for next friend status, but the Court viewed this omission as an error in pleading and allowed Lewis to amend her complaint (Doc. 15). The Defendants argue that the defect in Lewis's original complaint rendered the complaint a nullity and that the filing date of the original complaint is inapplicable for statute of limitations purposes.

The Court later granted Lewis leave to amend her complaint to properly state claims against Thomason in his individual

15

capacity (Doc. 59). In the order granting leave to file the third amended complaint, the Court noted that the Plaintiff proceeded based on the assumption she had properly stated claims against Thomason in both his individual and official capacities and that the Defendants have been on notice that an action may lie against Thomason in his individual capacity. *Id.* To ensure that Thomason was not prejudiced by the amendment, the Court continued the trial to its present date.

An amendment adding a defendant relates back if three conditions are met. First, the amendment must assert a claim that arose out of the original occurrence. Fed. R. Civ. Pro. 15(c)(1)(B). Second, the new party must have received such notice of the action that it will not be prejudiced in defending on the merits. Fed. R. Civ. Pro. 15(c)(1)(C)(i). Third, the new party must know or should have known that the action would be brought against it but for a mistake concerning the proper party's identity. Fed. R. Civ. Pro. 15(c)(1)(C)(ii).

As explained in the Court's order allowing Lewis to amend her complaint for the first time (Doc. 15), the Court views Lewis' failure to properly plead next friend status an error in form, not a failure of subject matter jurisdiction as argued by Defendants. The claim against Thomason in his individual capacity is based on the same occurrence as the official capacity claim. Thomason has been on notice that an action may

16

lie against him in his individual capacity. Thomason is not prejudiced by the amendment since the Court allowed him additional time to conduct discovery and to prepare for trial. Finally, Thomason should have known an action would have been brought against him but for a mistakenly ambiguous description of which capacities Thomason faced liability. Therefore, Lewis's Third Amended Complaint (Doc. 65) relates back to her original complaint (Doc. 1). Lewis's claims for assault and battery are not barred by the statute of limitations.

### ii. Merits and Immunities

Assault is defined in Arkansas as an "intentional attempt by a person, by force or violence, to do an injury to the person of another, or as any attempt to commit a battery, or any threatening gesture showing in itself or by words accompanying it an immediate intention, coupled with a present ability, to commit a battery." *Costner v. Adams*, 82 Ark. App. 148, 156, 121 S.W.3d 164, 170 (2003). Battery is defined in Arkansas as a "wrongful or offensive physical contact with another through the intentional contact by the tortfeasor and without the consent of the victim, the unpermitted application of trauma by one person upon the body of another person." *Id.*

Arkansas has a statute that grants immunity to municipalities for unintentional torts:

(a) It is declared to be the public policy of the

17

State of Arkansas that all counties, municipal corporations, school districts, special improvement districts, and all other political subdivisions of the state and any of their boards, commissions, agencies, authorities, or other governing bodies shall be immune from liability and from suit for damages except to the extent that they may be covered by liability insurance.

(b) No tort action shall lie against any such political subdivision because of the acts of its agents and employees.

Ark. Code Ann. § 21-9-301. Arkansas uses the qualified immunity statute for state employees to guide judicial interpretation. State employees in Arkansas have qualified immunity from civil liability for non-malicious acts occurring within the course of their employment. *See City of Fayetteville v. Romine*, 373 Ark. 318, --- S.W.3d ---, 2008 WL 1903469 (2008). However, state and county employees are liable for malicious acts and carry no special immunity for these acts. *See Simmons v. Marshall*, 369 Ark. 447, 452, 255 S.W.3d 838, 842 (2007).

In this case, there is a genuine issue of material fact as to whether Thomason shot at Brown as he ran into the woods and then shot him again while he was trying to surrender. Such actions, if true, would constitute a malicious act and would amount to assault and battery. As discussed *supra*, on these facts, Thomason is not entitled to qualified immunity. Defendants' Motion for Summary Judgment for assault and battery is hereby **DENIED.**

18

### b. Outrage

In Arkansas, the tort of outrage has four elements: (1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was 'extreme and outrageous,' was 'beyond all possible bounds of decency,' and was 'utterly intolerable in a civilized community'; (3) the actions of the defendant were the cause of the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it. *Kiersey v. Jeffrey*, 369 Ark. 220, 222, 253 S.W.3d 438, 441 (2007).

In this case, no evidence that Brown suffered emotional distress as a result of this incident has been presented to the Court. The Plaintiff's brief points to testimony that Brown was physically weaker after the shooting, but that testimony does not address Brown's emotional state. Because there is no genuine issue of material fact concerning Brown's emotional distress, Defendants' Motion for Summary Judgment on the claim of outrage is **GRANTED**.

### c. Wrongful Death

Arkansas's wrongful death statute creates a cause of action when the death of a party is caused by a wrongful act that would have allowed the injured party to maintain a cause of action and recover damages if death had not ensued. Ark. Code Ann. § 16-62-

19

102(a)(1).

In a wrongful death case, the plaintiff must show that the underlying tort proximately caused the decedent's death. *See Scott v. Central Ark. Nursing Centers, Inc.*, 101 Ark. App. 424, 2008 WL 588585 (Mar. 5, 2008). Proximate cause has been defined as "that which in a natural and continuous sequence, unbroken by any efficient intervening cause, produced the injury, and without which the result would not have occurred." *Union Pac. R.R. Co. v. Sharp*, 330 Ark. 174, 181, 952 S.W.2d 658, 662 (1997). Proximate causation is usually an issue for the jury to decide, and when there is evidence to establish a causal connection between the negligence of the defendant and the damage, it is proper for the case to go to the jury. *City of Caddo Valley v. George*, 340 Ark. 203, 213, 9 S.W.3d 481, 487 (2000).

Brown's death occurred on February 15, 2008. The autopsy report, authored by forensic pathologist Dr. Frank Peretti, listed the cause of death as hypertensive arteriosclerotic cardiovascular disease. Dr. Peretti speculated that Brown's gunshot wounds could have aggravated his heart disease. Dr. Tilley, thought that a gunshot wound could worsen Brown's pre-existing medical conditions. However, Dr. Tilley said he had no "basis or opinion" as to whether the gunshot wound accelerated the decline in Brown's medical condition. Brown suffered from diabetes, hypertension, and chronic obstructive pulmonary

20

disease.

Brown's death occurred well over a year after Thomason shot him. Brown suffered from multiple serious illnesses and the connection between the shooting and Brown's eventual death is speculative at best. No reasonable jury could decide that Thomason caused Brown's death based on the evidence before the Court. There is no genuine issue of material fact that Thomason's actions caused Brown's death. Defendants' Motion for Summary Judgment on the Wrongful Death claim is **GRANTED.**

### 4. State Law Claims Against the City of Rockport

#### a. Vicarious Liability for Intentional Torts

Ark. Code Ann. § 21-9-301 gives immunity to political subdivisions for negligent acts, but not intentional acts, except to the extent they are covered by liability insurance. *City of Farmington v. Smith*, 366 Ark. 473, 478, 237 S.W.3d 1, 5 (2006). Municipal liability for intentional torts comes under *respondeat superior*. "The doctrine of respondeat superior assigns liability to an employee's expected acts that are incidental to the employee's duties or that benefit the employer; liability attaches when an employee commits a foreseeable act within the scope of his employment at the time of the incident." *Costner v. Adams*, 82 Ark. App. 148, 154, 121 S.W.3d 164, 168-69 (2003).

In this case, the issue of Rockport's liability turns on questions of whether it was expected and forseeable that Thomason

AO72A
(Rev. 8/82)

would shoot at Brown from the road and then shoot Brown as he was trying to surrender. The evidence of the forseeability of these acts is limited to one past allegation of verbal abuse by Thomason. Even assuming that Thomason did once verbally abuse someone, that one incident is insufficient to create a genuine issue of material fact that shooting Brown as he was trying to surrender was an expected or forseeable act. Summary Judgment for the City of Rockport on liability arising from Plaintiff's assault and battery claims is hereby **GRANTED.** With the dismissal of the intentional tort claims against the City of Rockport, any punitive damages claims against Rockport are also dismissed.

### b. Negligent Hiring and Supervision

Arkansas municipalities' liability for negligence extends only as far as their insurance coverage. Ark. Code Ann. § 21-9-301. A municipal corporations's immunity only begins where its insurance coverage leaves off. *City of Caddo Valley*, 340 Ark. at 209, 9 S.W.3d at 484.

In this case, it is undisputed that the City of Rockport has no insurance coverage. Therefore, it is statutorily immune from liability for negligence. Summary Judgment on Lewis's claims for negligent hiring, supervision, training, and retention is hereby **GRANTED.**

## D. Conclusion

Defendant's previous Motion for Summary Judgment (Doc. 49)

is **DENIED AS MOOT.** Defendants' Motion for Summary Judgment on the § 1983 claims premised on wrongful arrest and state law claims of outrage and wrongful death is **GRANTED** and those claims are **DISMISSED WITH PREJUDICE.** Defendants' Motion for Summary Judgment on all claims based on official capacity liability and all claims against the City of Rockport is **GRANTED** and these claims are **DISMISSED WITH PREJUDICE.** Lewis's claims against Thomason in his individual capacity premised on § 1983 liability for excessive force as well as state law assault and battery remain, and Summary Judgment on these claims is **DENIED.** This case remains set for jury trial on March 2, 2008 in Hot Springs.

IT IS SO ORDERED this 20th day of February, 2009.


/s/ Robert T. Dawson
Robert T. Dawson
United States District Judge